[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Natasha H.[1] was born on April 19, 1989. The child was committed (neglected/abused) to the Department of Children and Youth Services (DCYS) on April 23, 1990 for the statutory period of eighteen months.[2] The mother of the child is Bridgette H., date of birth January 28, 1970; the named father is Pedro F., "unknown."
The petition to terminate parental rights was filed May 30, 1991.[3] The statutory grounds originally alleged as to respondent/mother were Section 17a-112(b) (1) (Abandonment), (2) (Failure to Rehabilitate), and (3) (No Ongoing Parent-Child Relationship);[4] with respect to CT Page 1215 the named father, the petition alleges grounds under Section17a-112(b)(1) (Abandonment) and (4) (No Ongoing Parent-Child Relationship).
Notice and Jurisdiction
The termination petition shows Bridgette H.'s whereabouts, as of the date of filing, at a federal detainment facility in Puerto Rico. The named father of the child, Pedro F., is shown as "Unknown." The order for notice and hearing directed notice to be mailed to respondent/mother, by certified mail, restricted delivery, return receipt requested, at the detention facility. With regard to respondent/father, the order directed notice by publication in The Hartford Courant. The official court file contains receipts for a certified mailing, and delivery, to respondent/mother. The file also contains a confirming affidavit filed by the newspaper on June 5, 1991 indicating legal notice by publication as to the father.
It is hereby found that notice to the parties has been effected in accordance with the requirements of law, and, that the court has jurisdiction to hear and adjudicate this termination petition. General Statutes Sections 17a-112,45a-716, and 45a-717.
During the course of the trial on the instant petition, respondent/mother was at all times in federal custody; she appeared through counsel, was transported to court for trial dates, and fully litigated this termination petition.[5]
Pedro F. did not respond to the newspaper publication, never appeared, and, with respect to the respondent/father, a default is hereby entered.
STANDARDS OF PROOF
With regard to "termination of parental rights", that term is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except that it shall not affect the right of inheritance of the child nor the religious affiliation of the child." General Statutes45a-707(g). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 168 Conn. 421, 430
CT Page 1216 (1975).
The constitutional guarantee of Due Process of law requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing" evidence, not merely a fair preponderance. Santosky v. Kramer, 455 U.S. 75 (1982). Thus, the standard of proof as mandated by Conn. General Statutes Section 17a-112(b) and Practice Book Section 1049 is "clear and convincing" evidence.
Termination of parental rights is in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In Re Juvenile Appeal (84-AE), 192 Conn. 254, 262
(1984); In Re Nicolina T., 9 Conn. App. 598, 602 (1987); In Re Luke G., 40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds, may inquiry be made regarding the ultimate best interest of the child.
Factual Findings
A. Factual Findings as to Events Antedating the Filing of Petition
The credible evidence presented to the court established the following facts. On December 9, 1989, Natasha H., then eight months old, was the victim of a brutal, cruel sexual assault which occurred when the mother left the child, for approximately one hour, in the care of a fifteen-year old male babysitter.[6] As a result of the assault, Natasha remained in the hospital for several days, required vaginal surgery, was discharged to the custody of DCYS under the authority of an OTC, and was placed in foster care. The child was in two foster homes between December 15, 1989 and January 5, 1990;[7] on the latter date, Natasha was placed by DCYS in a third foster home, that of Mrs. A. of Stafford, where the child has remained continuously to date.[8] The A. residence was a specialized foster home, Mrs. A. having had training and experience with sexually abused foster children.[9]
CT Page 1217
Respondent/mother, twenty-two years old, is unmarried, and dropped out of high school after completing nine grades; she testified that, she recently obtained GED certification. While pregnant with Natasha, and for a period of time subsequent to the child's birth, Bridgett H. resided in Hartford with her mother (Natasha's maternal grandmother), Gisele H. (date of birth September 19, 1951); at some point prior to late November 1989, Bridgette H. moved with the baby from the maternal grandmother's residence to her own apartment. As stated, the sexual assault on Natasha occurred on the evening of December 9, 1989 at the mother's Hartford apartment. Also residing at the maternal grandmother's residence, both before and following the departure of Bridgette H., was the child's maternal aunt, Chantel H. (date of birth March 28, 1974).[10] On December 9, 1989, respondent/mother, together with a paternal aunt, was present at the hospital emergency room with the baby. Documentation indicates that the mother was very upset and concerned about what had happened to Natasha, although the mother's candor with investigating authorities was placed in serious question. During Natasha H.'s hospitalization, and thereafter, members of respondent/mother's family including, in addition to those identified heretofore, the maternal great aunt, Louise N. (date of birth July 30, 1950), and the maternal great grandmother, Teresa M. (date of birth March 17, 1920), expressed genuine concern, and were noticeably shaken, over what had happened to Natasha;[11]
members of the mother's family have felt that Natasha should not have been placed in foster care with a stranger, but rather, should have been placed by DCYS with a family member.
The initial DCYS case worker was Ms. Cocchi. Respondent/mother told the worker that she would be returning to reside with the maternal grandmother, Gisele H.; in view of the placement outside of the home, visitation was requested, and was to be arranged with the foster mother. Shortly thereafter, and prior to the commitment of Natasha H., Ms. Cocchi transferred the case to another DCYS social worker, Mr. Coley. Respondent/mother, and members of her family, maintain that discussions were had with Mr. Coley regarding moving Natasha from the Stafford foster home of Mrs. A. to a location in, or closer to, Hartford, for the purpose of facilitating, and making the child more accessible for frequent visitation. The visitation at the A. foster home began around January 9, 1990; a visitation schedule was CT Page 1218 worked out with the foster mother providing, initially, for two visits per week, on Wednesdays and Saturdays, to be supervised by the foster parent. During the period between the placement of the child and commitment, respondent/mother and family members exercised visitation as frequently as permitted under the arranged schedule. Respondent/mother normally came to the Stafford foster home with the maternal grandmother and/or the maternal great grandmother; on occasion, the maternal aunt, Chantel H., would be present for the visitation. If the mother was not transported to Stafford by a family member, she would come for visitation in an automobile borrowed from a friend.
On April 23, 1990, Natasha was adjudicated a neglected/abused child and committed to DCYS. With respondent/mother present, expectations were established by the court and were set forth in a CIP agreement form signed by respondent/mother and her attorney. The CIP form, dated April 23, 1990, contained this statement: "Notice to Parents: If you fulfill the court expectations, you will improve your chances of rejoining, or keeping, guardianship of your child permanently. Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCYS worker." The court-set expectations, as included in the CIP agreement form, signed by Bridgette H. and her attorney, were as follows: (1) keep all appointments set by, or with, DCYS; (2) keep whereabouts known to DCYS and your attorney; (3) visit the child as often as DCYS permits; (4) participate in individual counselling; (5) participate in drug/alcohol assessment and counselling; (6) follow through on recommendations; (7) secure and maintain adequate housing; (8) secure and maintain adequate income; (9) no substance abuse; (10) no involvement with the criminal justice system; and (11) no association with substance abusing persons.
Following the adjudication and commitment of Natasha H., respondent/mother continued to visit regularly at the A. foster home. A positive and amiable relationship developed between Mrs. A. and Bridgett H., and also with members of Bridgett's family. In time, since there were no problems with the visitation, Mrs. A. discussed with the DCYS worker the extent to which visits needed to be supervised; it was CT Page 1219 agreed that the child could visit alone in another room with her mother and family, or in the pleasant weather, out in the yard of the A. home.[12]
In October 1990, the case was transferred to another DCYS social worker, Ms. Nieuwsma. In early November 1990, reunification efforts had proceeded to the point that unsupervised visitation was being permitted; overnight visitations were authorized whereby the mother would take the child home on specified dates during the holiday season. Into December 1990, there were scheduled overnight weekend visitations where Natasha was to be picked up at 10:00 a.m. Saturdays and returned to the foster home on Sunday evenings at 8:00 p. m. During this period, respondent/mother lived with the maternal grandmother, Gisele H.; Bridgette H. did not own a car and relied on family members for transportation in connection with visitation.
When Ms. Nieuwsma was assigned the case, she promptly conferred with respondent/mother regarding the expectations that were established by the court at the April 23, 1990 commitment hearing. While the visitation had proceeded reasonably well through November 1990, concern was expressed with respect to compliance with certain of the other expectations, particularly substance abuse counselling. The Department referred mother to the Blue Hills facility for a substance abuse assessment and follow-up therapy; respondent/mother did not go to Blue Hills on the initial referral. However, she was evaluated in late November 1990, and weekly attendance at NA meetings was recommended; written confirmation showed attendance at just one such meeting. Additionally, by early 1991, difficulty was being encountered in communicating with Bridgette H., although the Department understood that she was still residing with the maternal grandmother. Ms. Neuwsma testified that she was often unable to reach Bridgett telephonically at the maternal grandmother's residence, or through the great grandmother; family members often stated that did not know where respondent/mother was, and messages left for the mother to call the worker were not promptly responded to, often for several days.
Ms. Nieuwsma remained the social worker on the case until late January, 1991. By that time, concerns had also developed as to the condition and behavior of the child when CT Page 1220 she returned from visitation, the necessity of spending sufficient time with Natasha during the unsupervised visitation, and the value of consistent visitation. Additional concerns had developed regarding respondent/mother's continuing failure to follow through on referrals. Respondent/mother was referred to appropriate counselling; two appointments were scheduled in January 1991, but Bridgette H. did not appear despite repeated reminders that she must keep appointments for such counselling sessions.[13] Also, the worker became concerned that the mother had not followed through with arrangements for a parent-aide for the period visitation with the child was to be at her home. Bridgette H. did indicate her willingness to work with the parent-aide for assistance with appropriate parenting techniques, but, according to Ms. Nieuwsma, the mother did not meet with any representative of the parent-aide service.[14] The court established expectations called upon the mother to secure and maintain adequate income; in that regard, the worker referred respondent/mother to JTPA, an agency federally funded to assist indigent persons find suitable employment. Bridgette H. initially appeared agreeable to the referral and went to the JTPA office, but did not follow through with establishing eligibility for city assistance, and thereafter, with providing JTPA with the necessary eligibility documentation.[15]
When Ms. Nieuwsma transferred the file, the assessment was that progress had been made toward reunification, particularly in the area of visitation and maintenance of regular contact with the child, but that problems had arisen in "connecting with" mother and concerns existed regarding her follow-through on referrals made by DCYS in conformity with the expectations set by the court at the April 23, 1990 commitment hearing.
On or about February 5, 1991, Ms. Gerber, the DCYS worker newly assigned to the case, was contacted telephonically by respondent/mother; a meeting was scheduled for a few days thereafter at the DCYS office.[16] In the office, the new social worker discussed in detail the April 23, 1990 expectations with Bridgette H. With respect to counselling, respondent/mother questioned whether it would be covered through medical insurance; the mother acknowledged that she had failed to follow through on the CFS referral and had missed appointments with the parent-aide. In discussions with respondent/mother, the social worker stated that a Service Agreement would be prepared setting forth just what CT Page 1221 would be expected of the mother, and the agency, with respect to the reunification effort; the Service Agreement would substantially parallel the court-set expectations. On the subsequent visitation (or on or about February 12, 1991), respondent/mother did pick up the child, but had overslept and missed the parent-aide appointment. On the following weekend, the mother failed to appear at the foster home to pick up Natasha, and did not contact the foster parent; the social worker later discussed this with respondent/mother who indicated that she was encountering transportation problems with respect to the trip from her residence (the maternal grandmother's home located in the west end of Hartford) to the Stafford foster home of Mrs. A.[17] The social worker agreed to provide respondent/mother with bus passes and it was arranged that Mrs. A. would drive to the Rockville bus station and meet the mother.[18] In additional discussions with the mother, it was agreed the social worker would transport Bridgette for appointments with the parent-aide. Around February 28, 1991, respondent/mother spoke with the foster mother indicating that she had met with the parent-aide, but did not have transportation to visit the child; the mother spoke to Natasha on the phone. Around March 6, 1991, the social worker picked up the child at the foster home, and brought the child to the mother's home for visitation; respondent/mother was also transported by the social worker for a meeting with the parent-aide. About this time, the mother was given the bus passes to enable her to get to councelling and to travel to Rockville. On or about March 6, 1991, the worker had the prepared Service Agreement, and the document was signed by Bridgette H. Under the terms of the Service Agreement, respondent/mother agreed to: (1) visit the child on a regular basis; (2) cooperate with the parent-aide; (3) participate in individual counselling; (4) attend N/A meetings and provide DCYS with proof of attendance; (5) obtain employment; and (6) maintain contact and cooperate with DCYS. As per the written Agreement, the Department was committed to: (1) provide mother with a monthly bus pass; (2) arrange for the child to be at mother's house for appointments with the parent-aide; and (3) maintain contact with mother and foster mother. Ms. Gerber never heard from respondent/mother subsequent to March 6, 1991.
On the date of respondent/mother's last visitation with Natasha (March 6, 1991), which was also the date that the Service Agreement was signed, it clearly remained the CT Page 1222 intention of the Department to take all necessary steps needed to effectuate a reunification of the child with her mother. The social worker testified: "there was a definite sign that there was a bond between the child and the mother . . . because when I was taking the child back to the foster home, the child was crying . . . bye, by, Mommy. . . . I had Bridgett sign [the] service agreement . . . that she would comply with the Court expectations . . . our goal was to have the child returned to her, and she needed to be consistent with the visits and the parent-aide and the counselling."
On or about March 11, 1991, the foster mother was expecting a call from Bridgette regarding visitation; none was received. On March 13, the foster mother was to bring the child to Hartford; apparently the mother had called the parent-aide to confirm a March 13, 1991 appointment. The foster mother arrived with the child at respondent/mother's home at about 11:30 a.m., but the mother was not there; the parent-aide, who had arrived earlier, left her card with the mother's sister, Chantel H. It was indicated that Bridgette H. had left the home earlier, perhaps for an employment interview, but the sister was not certain, and she had not been informed of the scheduled visit with the parent-aide. The social worker, foster mother, and parent-aide all left messages with Chantel H. for respondent/mother to contact them; no response was received from the mother. In view of the problematic situation, the social worker, Ms. Gerber, met with her supervisor and arranged, through the court's CSO, the scheduling of a CSC for the end of March or early April 1991. On or about March 28, 1991, Chantel H. telephoned DCYS stating that the family had been notified respondent/mother was incarcerated in Puerto Rico.[19]
Respondent/mother first returned from Puerto Rico, in the custody of federal marshals, in mid-January 1992, for the commencement of this trial. Following the arrest, the mother's family continued to visit and maintain contact with the child who remained in foster care.[20] In April 1991, the child's maternal great grandmother advised the Department that she wished to be considered a resource for the child; according to the social worker, Mrs. M. indicated that she would be in a position to serve as Natasha's caretaker until such time as Bridgette H. was released and could provide a home for her daughter.[21] The child's maternal uncle, CT Page 1223 Daniel H., also communicated with the Department during April or May of 1991; this gentleman was, at that time, a member of the Armed Forces stationed in Japan. The worker undertook to contact him through the American Red Cross asking that he submit his wishes to the Department in writing; the worker testified that no such written communication was received from the maternal uncle.
The putative father of the child, named on the instant petition, is Pedro F.; information in the file indicates that he is approximately twenty-six years of age and had resided in Hartford prior to being incarcerated at the Somers Correctional Institution. Documentation further indicates that the paternal grandmother brought Natasha, on one occasion, when the child was approximately six months of age, to visit respondent/father at Somers. Pedro F. has had no contact whatsoever with the child since her placement: he has never contacted DCYS concerning Natasha, and his whereabouts have remained unknown.
Following notification of respondent/mother's arrest in Puerto Rico, the Department's "course" changed from that of reunification to permanency planning for Natasha through termination of parental rights and adoption. As stated, this petition to terminate parental rights was filed by DCYS on May 30, 1991.
B. Factual Findings As To Events Subsequent To The Filing of Petition
On May 31, 1991, respondent/mother, pursuant to a plea agreement filed in open court, pled guilty in the United States District Court, District of Puerto Rico, to one count of the federal indictment charging a violation of Title 21, United States Code, Section 2. In a stipulation annexed to the plea agreement, bearing respondent/mother's signature, it was agreed that the Government was in possession of evidence indicating that on March 19, 1991, Bridgette H., with another, arrived at an airport in Carolina, Puerto Rico, on board an American Eagle flight from La Romana, Dominican Republic, with a package strapped to her mid-section with an Ace bandage which was discovered by U.S. Customs Service personnel, and was determined to contain a quantity of cocaine. In this plea agreement, it is stated: CT Page 1224
 "[Respondent/mother] understands that she may be sentenced to a term of imprisonment of at least five (5) years and up to a maximum of forty (40) years. Additionally, the court may impose a supervised release term of not less than four years."
The date of sentencing in the United States District Court was initially September 10, 1991; as stated heretofore, as of the February 1992 trial date on this petition, respondent/mother had not been sentenced; apparently the federal sentence was imposed at some point between February 3, 1992 and late April or early May 1992 when it was reported that she would be serving her sentence in Danbury.[22]
Evidence presented at trial, including DCYS' Addendum To Termination Study (August 17, 1992), indicates that respondent/mother was tentatively scheduled for release in December 1992.
On or about June 5, 1991, respondent/mother wrote the foster mother from Puerto Rico inquiring of the child; the letter stated that the mother loved the child, regretted what she had done, and would like to receive information regarding the child, including a recent picture of Natasha. The foster parent did not respond to the June 5 letter, or to another letter received from Bridgett H. around July 1, 1991. The foster mother testified that she was deeply hurt by what had occurred and did not feel she could correspond with respondent/mother:
 "I felt that any letters I wrote would only further upset Bridgett, because I did not feel I could write a letter to her without telling her how upset I was, how angry I was with what she had done.
 . . . Not just the fact that she got arrested. I am very disappointed in the fact that she let the child down by not reunifying with the child in a reasonable amount of time. . . ."
A number of cards and other items were forwarded by respondent/mother to the child at the foster home; although the foster mother did not answer Bridgette H.'s letters, she showed or gave the cards received to Natasha, explaining that the cards, etc., were from her mother. Since the foster CT Page 1225 mother did not write back to Bridgette H., the latter sent additional cards for the child to the great grandmother, Teresa M., for delivery to Natasha.[23] It is asserted that certain of the cards, etc., may have been sent prior to the filing of this petition, but the cards are either undated, or post-date the instant petition.
The family continued contact with the child while respondent/mother remained in custody in Puerto Rico. When Teresa M. and a sister came to visit at the foster home on June 12, 1991, Mrs. A. discussed with the maternal great grandmother the possibility of the child visiting with Teresa M. during the summer while Mrs. M. was vacationing in Sherbrooke, Quebec.[24] In July 1991, Teresa M. informed the Department that she would be interested in assuming the legal guardianship of Natasha H.; she previously had inquired of DCYS, in May 1991, regarding continuing visitation with the child and was told it would continue as before, on a once a month schedule. During August 1991, Mrs. A. brought Natasha to visit with Teresa M., and later in the month, the maternal grandmother and maternal aunt visited at the foster home. During the remainder of 1991, members of the family continued to visit with Natasha on a fairly regular basis; Teresa M. took the child for Thanksgiving Day and Christmas Day. Visitation by family members continued throughout the course of this trial;[25] on August 28, 1992, after having heard the testimony presented on the petitioner's case in chief, and upon dismissal of the no ongoing parent-child relationship ground (as to respondent/mother), the court directed that the mother have visitation with Natasha at the Juvenile Court on court dates.[26]
The family plan contemplates placement of the child with the maternal great grandmother, Teresa M., who would assume full-time care of the child. Louise H., the maternal great aunt, who now resides in the great grandmother's house, would serve as a "back-up" for Mrs. M., assisting in the care of the child, and with the understanding that Ms. H. would assume the care responsibilities for Natasha if, at any time, Teresa M. became unable to do so (and the respondent/mother had not been released from confinement, or was not otherwise in a position to provide suitable care for the child).
Teresa M. is seventy-two years of age; she resides in a CT Page 1226 single family ranch home in a suburban community proximate to Hartford. Mrs. M. is a very active lady, often driving to Canada to visit with her family; she does her own grocery shopping, cleaning, and laundry, and, with the assistance of her son, maintains a large vegetable garden during the summer months. Mrs. M. is a widow; her husband, whom she cared for through a protracted period of illness, died in November 1991. Her daughter, Louise H., and two adult sons reside in Mrs. M.'s home; the house has three bedrooms and a finished downstairs family room. One son currently lives downstairs; according to the great grandmother, if she had Natasha, both sons would sleep downstairs, and the extra bedroom would be for the child (or for Natasha and her mother, upon the mother's release). Teresa M. has visited the child regularly over the years of placement,[27] loves the child, is known to the child, is committed and willing to assume the caretaking responsibilities for the child, and has communicated to DCYS (a number of times) her availability; she offers her daughter Louise H., who has resided with her since the beginning of August 1992, as a "back-up" caretaker.
Louise H., respondent/mother's aunt, is forty-two years of age; she too has visited with the child during the placement. Prior to recently moving in with Mrs. M., she resided in a different suburb of Hartford with a male companion, L.G., and three children: Jeannot H. (date of birth August 8, 1969), M.G., and B.G. Louise H. has been employed at an automobile dealership as a sales representative for approximately one year. Prior employment has included service as the permittee of a private club for roughly one and one-half years, and work in the office of a drywall company for about seven years. Louise H. testified that she had told DCYS she would gladly serve as a "back-up" caretaker, but, prior to moving to her mother's residence, was not in a position to care for the child full-time. Mrs. H. testified that she would willingly be a "back-up" caretaker for Mrs. M., and, she now would be agreeable to take Natasha and assume the caretaking responsibilities. She feels the child should be returned to respondent/mother at such time as the mother is able to appropriately care for Natasha; Mrs. H. believes that upon the mother's release, the child should not be in Bridgette H.'s care until such time as the mother has received "counselling or therapy. CT Page 1227
Gisele H., the maternal grandmother, now resides out of state, apparently relocating from Connecticut around May 1991 .
Bridgette H., now approaching twenty-three years of age, is a certified nurse's assistant and, according to her testimony, worked for her GED while in the federal corrections facility. She has been doing outside landscaping work at the federal prison, attends NA sessions weekly, is in counselling with a psychologist, and has enrolled in parenting and self-esteem classes. She understood her release date to be on or about December 13, 1992. She testified that she loves her daughter, misses her, and wants to raise the child; the mother feels that at a future time she would be in a position to assume the caretaking responsibilities for the child, stressing that prior to going to Puerto Rico, she had had the child for overnight visitation and encountered no particularly difficult problems in caring for Natasha. Regarding her maternal affection for the child, Bridgette H. emphasizes that after her arrest in Puerto Rico, she directed inquiries to the foster mother concerning the child, and made efforts to maintain continuing contact with Natasha.
The foster parent, Mrs. A., is not a permanent resource for Natasha H. The Department states (Addendum To Termination Study, 8/17/92) that it has "explored various family resources and has concluded that those plans submitted are inappropriate." Testimony indicated that conclusions regarding the mother's family were formulated at the beginning of 1992, premised on information obtained during or before that time. DCYS' stated concern with the maternal great grandmother is her age and the contention that Teresa M. would merely be caring for the child until respondent/mother's discharge from federal custody. With respect to Louise H., it is pointed out by the Department that she previously declined to be considered a permanent foster care resource. The social worker testified that if termination is granted, the Department's plan is to pursue adoptive resources for Natasha H. through the Adoptive Resource Exchange.
Adjudication
General Statutes Section 17a-112(b) sets forth the alternative grounds for termination of parental rights. In CT Page 1228 order to grant a petition to terminate, the court must determine that an alleged ground has been established by clear and convincing evidence. This evidentiary requirement necessitates a standard of proof that is between the standard required in an ordinary civil action and that required to find guilt; there must be "more than average certainty on the part of the fact finder." In Re Juvenile Appeal (84-3),189 Conn. 276, 297 (1983); Dacey v. Connecticut Bar Assn.,170 Conn. 520, 536-37 (1976); In Re Juvenile Appeal, 1 Conn. App. 463,467-68 (1984). The termination petition in the instant case, as stated, was filed on May 30, 1991.
A. Abandonment.
General Statutes Section 17-112(b)(1) provides: "The superior court upon notice and hearing may grant. . . [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interests of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which . . . shall not be less than one year . . . [t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ."
The test for factually determining statutory abandonment is not limited to simply whether the parent has shown some minimal interest in the child. In Re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14-15 (1981); In Re Rayna M., 13 Conn. App. 23, 36 (1987); In Re Adoption of Webb, 14 Wash. 651, 657 (1975). Statutory abandonment differs from the concept of abandonment in the common-law sense in that it does not require proof of an intention to abandon totally or permanently. In Re Shannon S., 41 Conn. Sup. 145,151 (1989), affm'd per curiam, 19 Conn. App. 20
(1989). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Migdalia M., 6 Conn. App. 194, 208-09 (1986). In the In re Migdalia M. decision, the Appellate Court stated that statutory abandonment occurs where "a parent fails to visit a child, fails to display love and affection for the child, has no personal interaction with the child, and no concern for the child's welfare." Id. at p. 209. CT Page 1229
Section 17-112(b)(1) refers to a parent's failure "to maintain" a reasonable degree of interest, concern or responsibility regarding the child's welfare. Thus, that statute does not contemplate a sporadic showing of the indicia of "interest, concern or responsibility for the welfare of the child," but rather, the term "maintain implies a continuing, reasonable degree of concern." In Re Rayna M., supra; In re Migdalia M., supra.
1. Respondent/Mother: Abandonment.
The court cannot conclude that petitioner has proved, by clear and convincing evidence, that respondent/mother abandoned Natasha H. The mother (and her family) visited regularly with the child from date of placement into early 1991; unsupervised visits were authorized, they took place, and, as the social worker testified, there existed a noticeable bond between mother and child, as late as March 6, 1991. While the evidence indicated that Bridgette H. was not compliant with certain particulars of the court's expectations, and that as of November 1991, concerns had arisen, the evidence does not demonstrate, clearly and convincingly, a failure on part of the mother to maintain reasonable interest, concern, or responsibility as to the welfare of the child.
With regard to respondent/mother's sudden departure from Connecticut in March 1991, and the subsequent arrest and incarceration in Puerto Rico, neither the criminal act nor the resultant incarceration, in isolation, provides a legal basis for a finding of abandonment. In re Juvenile Appeal (Docket No. 101555), 187 Conn. 431, 443 (1982). Our Supreme Court stated: "The trial court was careful to indicate that . . . imprisonment alone does not constitute abandonment, and in this it was correct . . . neither the criminal act itself nor the imprisonment which followed [was] the foundation on which the court's decision to terminate rests." Id. at p. 443; See also: In re Juvenile Appeal (84-6), 2 Conn. App. 705,711 (1984). Nevertheless, as further observed by our Supreme Court, the restraints necessarily imposed by the circumstance of incarceration do not necessarily excuse the parent from making use of the limited resources available in the corrections facility to undertake to maintain contact with the distant child. 187 Conn. supra at p. 443. At trial, CT Page 1230 petitioner asserted that after the arrest in Puerto Rico, little effort, if any, was made by respondent/mother to communicate with the child (calls, cards, letters and etc.) or other parties in Connecticut (DCYS, foster parent, etc.) regarding the child's welfare until the termination petition was filed (May 30, 1991). As stated, statutory abandonment has not been established, clearly and convincingly, up to the time of mother's mid-March departure; from that point to the filing of the TPR, constituted approximately a two and one-half month period. During that time frame, respondent/mother had been in touch with family members and, presumably, concluded that during her immediate absence the child would continue to be well-cared for in the specialized foster home.[28] In the court's view, respondent/mother claimed failure to communicate regarding the child for a matter of a few months immediately following her out-of-state felony arrest and imprisonment, when considered in the context of what transpired prior to March 1991, does not establish, clearly and convincingly, that she statutorily abandoned her child.[29] Said ground is dismissed as to respondent/mother.
2. Respondent/Father: Abandonment.
Respondent/father, Pedro F., was whereabouts unknown at the time of the filing of the TPR. His last known contact with Natasha H. was when the child was approximately six months of age. Incarceration alone does not constitute abandonment; In re Juvenile Appeal (84-6), supra at p. 711. However, the record discloses that Pedro F.'s whereabouts have remained unknown, he has never contacted DCYS concerning the child, and he has had no communication or contact with Natasha during her placement. With respect to respondent/father, petitioner has met a clear and convincing burden of establishing statutory abandonment.
It is hereby found, applying a clear and convincing standard, that petitioner has established statutory abandonment as a ground for the termination of the parental rights of Pedro F. to the child Natasha H., that is, that Natasha H. has been abandoned by respondent/father in that said respondent/father has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of said child. CT Page 1231
B. Failure to Rehabilitate.
General Statutes Section 171-112(b)(2) provides as follows: "The superior court upon hearing and notice may grant [a termination] petition if it finds, upon clear and convincing evidence, that termination is in the best interests of the child and that with respect to a non-consenting parent, over an extended period of time, which . . . shall not be less than one year . . . the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child. . . ."
The term "personal rehabilitation" refers to the restoration of a parent to his or her former constructive and useful role as a parent. In re Rayna M., 13 Conn. App. 23,32 (1987); In re Migdalia M., 6 Conn. App. 194, 203 (1986). Under the statute, the court must "analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, [determine] that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C., 210 Conn. 157, 167 (1989); In re Joshua Z., 26 Conn. App. 58, 64 (1991). Under Section17a-112(b)(2), the court is to consider the age and needs of the child with respect to whether the parent could, within a reasonable time, assume a responsible position in the life of the child. Cf. In re Migdalia M., supra at p. 199. A "responsible position" in the life of the child is not necessarily equivalent to a full-time caretaker; In re Migdalia M., supra at p. 206; and, it is not statutorily required that the parent become capable of assuming full responsibility for the child without the provision of available support programs. Id. at p. 203.
Natasha H. was adjudicated (and committed as) an abused child, i.e., a child with non-accidental serious physical injuries. DCYS has consistently maintained, quite appropriately, that the mother bears a significant degree of responsibility for what occurred on December 9, 1989 in that she was exceedingly remiss, and exercised very poor judgment. Respondent mother's long history of serious substance abuse is well documented and is not really in dispute.[30] DCYS CT Page 1232 contends that since the commitment, mother has failed to achieve such degree of personal rehabilitation as would encourage a belief that within a reasonable time she could, considering the age and needs of the child, assume a responsible position in Natasha's life.[31]
No significant evidence exists that the baby was not well-cared for, or was neglected, while in the care of the mother for the first eight months of her life, that is, prior to placement following the sexual assault.[32] Following the assault, DCYS viewed mother as somewhat defiant of authorities, and quite resentful that the child had been removed from her care and not placed with a family member. Bridgette H. was seen as not entirely candid regarding the December 9, 1989 incident, and as tending to minimize her own responsibility for what had happened to the child. Expectations were set at the time of commitment which were entirely consistent with the agency's, and the court's, concerns.[33] Regarding compliance, Bridgette H. maintained, and further developed, a relationship with the child through regular visitation; while concerns as to certain aspects of the visitation developed in late 1990, it is clear that there had been substantial compliance with the visitation expectation into March 1991, that a noticeable bond between mother and child had developed, and that reunification was still viewed a realistic goal.
In the period prior to mid-March 1991, the mother generally cooperated with DCYS, kept appointments, and kept her whereabouts known to the agency. Although in late 1990, the worker had difficulty "connecting with" mother, and messages were not promptly responded to, the mother, nevertheless, for the first ten months of the commitment, was not whereabouts unknown, had not disappeared or moved from the grandmother's residence, and generally, was in pretty regular communication with DCYS.[34]
Regarding compliance with certain of the other expectations, the following is noted. Prior to March 1991, the mother had resided in the maternal grandmother's home; there is nothing in the evidence to suggest that this residence constituted inadequate housing (albeit, not independent housing).[35] No evidence was presented that during the first ten months of the commitment, respondent/mother associated with substance-abusing persons, CT Page 1233 in violation of that expectation, unless an inference is to be drawn from the difficulties that developed in late 1990, and/or mother's departure and arrest in mid-March 1991.[36]
And, the evidence did not disclose substance abuse by respondent/mother from the date of placement forward.[37]
However, respondent/mother, prior to her departure from Connecticut, on the credible evidence, was non-compliant with other expectations in that she did not follow through on drug counselling, did not fully participate in individual counselling, and did not secure and maintain an adequate income. It is these issues which were principally addressed in the Service Agreement signed on March 6, 1991; clearly, at that point, however, much progress had been made, and reunification was the anticipated objective.[38]
In view of the March 1991 arrest in Puerto Rico, respondent/mother did not comply with the expectation of no involvement with the criminal Justice System. Petitioner argues that although this was a case "on the brink of reunification", it "turned to a case of termination of parental rights" because of mother's having again exercised extremely poor judgment by engaging in drug courier activities to the detriment of the interests of her baby.[39] Notwithstanding, certain legal principles pertain. First, the termination statute does not provide that to achieve personal rehabilitation, a parent must meet court-established expectations; and, even if a failure to rehabilitate resulted from non-compliance, that circumstance alone would not automatically, or perfunctorily, preclude a belief that a parent could, within a reasonable time, considering the age and needs of the child, assume a responsible position in the child's life. In re Migdalia M., supra at p. 206. Our courts have accepted the proposition that failure to fulfill court expectations does not, in and of itself, necessarily equate with, or compel, a conclusion that a parent could not assume a responsible position in the life of the child. In re Luis C., supra at p. 167.[40] A trial court is to consider the six factors enumerated in Section 17a-112(d) in determining whether a parent has failed to achieve rehabilitation. In re Michael M., 29 Conn. App. 112, 124-25
(1992); In re Sarah M., 19 Conn. App. 371, 377 (1989); In re Shavoughn K., 13 Conn. App. 91, 98 (1987). Additionally, the purpose of the instant proceeding is not to punish the mother for, or even to render any moral judgment regarding, the criminal CT Page 1234 activities in Puerto Rico.[41] In re Luis C., supra at p. 168; see also: In re Valerie D., 223 Conn. 492, 513 (1992) (the liberty interest of natural parents in the care and custody of their child "does not evaporate simply because they have not been model parents"). Furthermore, as stated, the fact that a parent is incarcerated is not, of itself, cause for termination of parental rights. In re Michael M., supra at p. 120, footnote 9; In re Juvenile Appeal (84-6), 2 Conn. App. supra at p. 711. Also, personal rehabilitation does not require an achieved status as a perfect, ideal parent, nor that a parent be capable of becoming the child's full-time caretaker, nor that a parent be in a position to provide care for the child without support services in place. In re Migdalia M., supra. Finally, it is a basic concept in this area of the law that there must be strict compliance with the statutory criteria before parental rights may be terminated.[42]
In re Valerie D., supra at p. 514; In re Jessica M., 217 Conn. 459, 466 (1991). Since the interest of the parent(s) in the child is a "fundamental constitutional right", a trial court "must keep in mind constitutional limitations imposed on [the] state when it undertakes coercive intervention in family affairs". In re Valerie D., supra at pp. 513-14.
The evidence fairly indicated that into early 1991, reunification was not only anticipated, but was seen as likely to occur in the relatively proximate future.[43]
The concerns related, as stated, not so much to the mother's fitness or capacity to parent, but rather, as somewhat evidenced by the Service Agreement, her non-compliance (or, perhaps, a failure to literally comply) with certain of the court's expectations set back in April, 1990. Since the Department, in early 1991, contemplated that the mother would eventually have the full-time care of Natasha, it certainly appears that at that time, Bridgette H. was viewed as having achieved a degree of personal rehabilitation as would encourage the belief that within the foreseeable future, she could assume a responsible position in the child's life.
The issue thus presented is whether the mid-March 1991 arrest and incarceration in Puerto Rico (on serious drug charges), when considered in the light of what had occurred up to that time (and thereafter), establishes, clearly and convincingly, that respondent/mother has failed to achieve such degree of personal rehabilitation as would encourage the CT Page 1235 belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in Natasha's life. As stated, incarceration alone is not a basis for termination; and non-compliance with certain of the court-set expectations, does not, in and of itself, constitute a failure to achieve personal rehabilitation, or necessarily demonstrate an inability to assume a responsible position in the child's life in the reasonably foreseeable future. Of course, the court can consider the seriousness of the felonious activity which resulted in the arrest and incarceration, as well as the nature of the activity in the light of the mother's prior substance abuse history. In this regard, however, the evidence did not establish that mother resorted to drug use during the commitment period. With regard to incarceration (considering such fact in the light of all the circumstances), it has not been established, clearly and convincingly, that the imposed federal sentence would preclude the mother from exercising, within a reasonable time, a primary role in the raising of this child; as stated, there is evidence (some of which is contained in the petitioner's own documentation) that the mother's tentative release date was in December 1992.[44]
There must be strict compliance with the statutory requirements as a precondition to termination of parental rights; and the burden of establishing the statutory ground(s) is proof by clear and convincing evidence, which burden rests on the petitioner. In view of the rehabilitation progress that had been made by respondent/mother into early 1991, when DCYS viewed reunification as a perfectly realistic goal, and had planned to return the child to the mother's full time care within a matter of a few months, I am unable to conclude that it has been established, by clear and convincing evidence, that respondent/mother, primarily and/or substantially as a result of her mid-March arrest and incarceration, failed to achieve such degree of personal rehabilitation as would encourage a belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child.[45]
Petitioner has not proved, by clear and convincing evidence, the statutory ground of failure to rehabilitate, and said ground is hereby dismissed.[46]
CT Page 1236
C. No Ongoing Parent-Child Relationship
General Statutes Section 171-112(b)(4) provides, as follows: "The superior court upon hearing and notice . . . may grant . . . [a termination] petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to a non-consenting parent, over an extended period of time, which . . . shall not be less than one year . . . there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
The absence of a parent-child relationship involves a situation where the child has never known his parent so that no relationship ever developed between them, or where the child has clearly lost that relationship so that despite its former existence, it now has been completely displaced; our courts have stated: "`[i]n either case the ultimate question is whether the child has no present memories or feelings for the natural parent.'" In Re Juvenile Appeal (Anonymous),181 Conn. 638, 645-646 (1980); In Re Juvenile Appeal (84-3),1 Conn. App. 463, 479 (1984); In Re Shannon S., 41 Conn. Sup. 145,158 (1989). In applying the statute, "common sense" is to be utilized and "bizarre results" are to be avoided. In Re Juvenile Appeal (84-6), supra at p. 709. Our Supreme Court has held that the statutory definition of no ongoing parent-child relationship is inherently ambiguous when applied to noncustodial parents who must maintain their relationship with their children through visitation. In re Valerie D., supra at p. 531; In re Jessica M., supra at pp. 467-68. The Supreme Court has not decided whether it is constitutionally permissible to terminate when the state agency, through placement out of the parent's home, is largely or solely responsible for the existence of the ground on which the termination is based. In re Valerie D., supra at 532, footnote 35; In re Juvenile Appeal (84-BC), 194 Conn. 252,256, footnote 6 (1984). While normally the issue centers on positive feelings or memories on the part of child toward the parent, when dealing with an infant or child of a very tender age, the inquiry necessarily focuses on the CT Page 1237 positive feelings of the natural parent. In re Valerie D., supra.
Respondent/father was aware of the child's existence, the child at age six months having been brought to Somers, by the paternal grandmother, for visitation with him. The father's own family was aware of what had happened to the child, and of the involvement of DCYS; the paternal aunt was at the mother's apartment and at the hospital on the evening of December 9, 1989, and said aunt was interviewed by the police and by DCYS personnel regarding the dreadful incident which resulted in the child's placement. Pedro F. made no initial inquiry regarding the child, and since then, has exhibited no interest, affection, or concern for the child, never having contacted DCYS regarding Natasha, and remaining whereabouts unknown. There is nothing, either directly or inferentially, to indicate any sustained, positive feelings for the child on the part of the father, or that the child has any positive memories of her father. Since the father has had virtually no contact with the child since she was six months of age, and has neither inquired of his daughter, nor made any effort to initiate contact with her, during a placement of approximately three years, it is clear that there exists no ongoing parent-child relationship. To hold otherwise, would effectuate a "bizarre" result.
Considering that the father has had no contact with, and demonstrated no interest in, the child during her entire period of placement, it is indeed unlikely that a parent-child relationship would be established, or reestablished. The child is now approaching four years of age, and has been in foster care for most of her life; stability and certainty in the child's home situation is clearly consistent with Natasha's best interests. Thus, to allow further time for the unlikely establishment or reestablishment of an ongoing parent-child relationship would be detrimental to the best interests of this child.
It is hereby found, applying a clear and convincing evidence standard of proof, that petitioner has established that there exists no ongoing parent-child relationship between respondent/father and Natasha H., which means the relationship which ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to CT Page 1238 allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the child.
DISPOSITION
General Statutes Section 17a-112(b) permits the court to grant a petition to terminate parental rights only upon a determination, based on clear and convincing proof, that to terminate would be in the best interests of the child. Evidence was last received in this case on September 17, 1992.
Respondent/father has expressed no interest in the child, has never contacted DCYS, and, as stated, his whereabouts are unknown. However, since petitioner has not established, by clear and convincing evidence, a statutory ground for termination of the mother's parental rights, the child will not be freed for adoption. The primary purpose of terminating a biological parent's parental rights is to permit the permanent placement of the child in the home of adoptive parents. In re Juvenile Appeal (Docket No. 10718), 188 Conn. 259, 262 (1982) ("`. . . petitions for termination are presumably seldom brought unless prospective adoptive parents are available. . .'"); In re Juvenile Appeal (Anonymous), 177 Conn. 648, 673 (1979). Since an adoption of Natasha H. cannot be effected, the court is unable to conclude, on the evidence, that a purpose consistent with the child's best interests would be served by terminating Pedro F.'s rights. Absent a permanent separation from the natural parent(s) through the adoptive process, no legal impediment should be imposed regarding future relationships with the paternal family from which the child might benefit. A ground for termination of the mother's rights not having been established, the court finds that although grounds for terminating respondent/father's rights have existed for not less than one year, termination of Pedro F's parental rights would not serve a purpose clearly consistent with the child's best interests.
The court has considered, carefully, the factors enumerated in General Statutes section 17a-112(d)(1) through (6), and hereby finds, applying a clear and convincing evidence standard, the following:
(1) Contrary to respondent/mother's repeated assertions, petitioner did not impede or fail to facilitate visitation between Parent and child. The social worker(s) testified, CT Page 1239 credibly, that the child was initially placed in the Stafford foster home because it was the only suitable home available and, as time passed, it was deemed inadvisable to again move Natasha in view of the fine care she was receiving and the excellent adjustment she had made. Although the mother made it known that she was dependent on family members for transportation, she did not indicate that transportation was a problem and, in fact, did visit regularly. When very late into the visitation, difficulties regarding transportation were made known (see fn. 17), DCYS provided bus passes, arranged for the foster mother to assist in the transportation, and, on various occasions, actually transported mother and child.[47] Under the Service Agreement, prepared and executed in early March 1991, the agency obligated itself to continue to facilitate visitation through the issuance of bus passes and to arrange for the child to be at the mother's home on parent-aide days.
The expectations set by the court on April 23, 1990, when Natasha was committed, directed that the mother was to participate in drug abuse assessments and counselling. The respondent missed the first Blue Hills appointment, but did attend the next appointment for the assessment, after which DCYS agreed to overnight visits in the mother's home. The mother agreed to participate in NA, and furnished confirmation for attendance at one early meeting; thereafter, there is no credible evidence or confirmation that she followed through on substance abuse counselling. Thus, DCYS did assist mother with referrals for substance abuse counselling; however, as to timeliness, it appears from the evidence that DCYS' efforts regarding such counselling began several months after the commitment, i.e. in the latter part of 1990. It does not appear that substance abuse counselling for the respondent was put in place by DCYS in a particularly timely manner.[48]
Similarly, referrals were made by the agency respecting individual counselling and the obtaining of an adequate income, with respect to both of which the mother did not follow through. A satisfactory explanation was not presented, however, as to why the individual counselling referral was not made until 1991.[49]
Subsequent to mid-March 1991, DCYS could not continue with, or maintain, the provision of any of the aforestated services as the mother remained incarcerated in Puerto Rico. CT Page 1240
Services were not provided respondent/father as his whereabouts remained unknown and he never contacted DCYS regarding the child.
(2) There is no evidence that any party failed to comply with the terms of any orders entered by the court. However, as stated, certain court expectations, established on April 23, 1990, were not complied with: substance abuse counselling, procurement of adequate income, individual counselling, no involvement with the CJS, etc.
(3) There is no indication that the child has any emotional ties or feelings with respect to respondent/father since there has been virtually no contact between father and child (just one visit at Somers when child was approximately six months old).
In view of the mother's regular visitation with Natasha following the child's placement, which continued to mid-March 1991, there are feelings and emotional ties on the part of the child towards her natural mother.[50]
In view of the protracted period (three years) that Natasha has been in the A foster home, it is apparent that the child has feelings and emotional ties towards Mrs. A. and the members of the foster family.
(4) Natasha H. was born April 19, 1989, and is age three years, nine months. The child has been in foster care since she was eight months old. Considering the child's age, the long period she has been in foster care, and that the foster home is not a permanent resource, it is apparent that the establishment of stability and certainty as to her home situation is consistent with Natasha's best interests.
(5) Prior to mid-march 1991, Bridgette H. maintained a maternal relationship with the child through regular, generally consistent visitation, most of which, as stated, involved the mother's travelling some distance to the foster home; thereafter there was little or no contact with the child until around the time the termination petition was filed (5/30/91), at which time the mother undertook to correspond with the foster parent regarding the child (and sent cards, etc. to the child). The foster mother did not reply to the mother's inquiries and communications, for the reasons stated previously. While CT Page 1241 respondent/mother, prior to her March 1991 departure, could have done considerably more in terms of compliance with certain of the court set (4/23/90) expectations, she did, up to that point, visit regularly, generally cooperate with DCYS, and make noticeable efforts to work with the agency to effectuate a reunification with her child. Unfortunately, at the time when a reunification appeared to be reasonably imminent, the mother saw fit to disregard the recently executed Service Agreement, to engage in felonious activity, and to become involved with the CJS, all in derogation of her previous efforts. However, from late May 1991 on, the mother again made noticeable effort, given the circumstance of her out-of-state incarceration, to maintain a continuing relationship with her daughter, as demonstrated by the numerous letters, cards, etc., admitted in evidence.
Respondent/father has made no effort to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return to his home in the foreseeable future; as stated, he has remained whereabouts unknown, has had virtually no contact with the child, and has not contacted DCYS concerning his daughter.
(6) Prior to mid-March 1991, the mother was not, in any way, prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of any person or agency; the court cannot conclude that the Stafford foster placement, and its continuation, was unreasonable given the circumstances and reasons for that placement as established through the credible evidence. But regardless, the fact is that Bridgette H., to her credit, did visit regularly, and did develop and maintain a meaningful relationship with her daughter up to the time she voluntarily left this state to engage in illegal, drug related activity. It was that voluntary act, resulting in her incarceration in Puerto Rico, which subsequently impeded or diminished her continuing relationship with the child. After the mother's arrest in Puerto Rico, the foster mother could have, and should have, responded to the mother's inquiries regarding the child; however, considering the close, amicable relationship which had existed between the foster parent and the parent, Mrs. A's disappointment, disillusionment and bitterness (in terms of the mother's betrayal of the child) were somewhat understandable. Nevertheless, any restrictions on the mother's visitation or contact with the child were primarily the result of her incarceration in Puerto Rico. The evidence did not indicate that economic circumstances prevented or impeded respondent/mother CT Page 1242 from maintaining a meaningful relationship with Natasha H.
There is no indication that respondent/father was prevented from developing and/or maintaining a meaningful relationship with Natasha H. by the unreasonable act of any person or agency, or by economic circumstance.
Conclusion
For the reasons stated herein, it is not felt that petitioner has established, by clear and convincing evidence. a statutory ground under Section 17a-112(b) for termination of the parental rights of Bridgette H. to the child Natasha H. Therefore, it is further concluded that a purpose clearly consistent with the best interests of Natasha H. would not be served by termination of the parental rights of the respondent/father, Pedro F. The petition to terminate parental rights to Natasha H. is hereby Denied; and, the said petition may be, and hereby is, Dismissed.
Mulcahy, J.